McDONALD v. UNITED STATES.

Civ. A. No. 8384.

United States District Court
D. Massachusetts.

June 6, 1950.

The following is the report of Charles A. Haskins, Master:

### Introduction

This is a suit brought under the provisions of 38 U.S.C.A. § 817 by Mary E. McDonald against the United States on account of a National Service Life Insurance policy issued to John Harold McDonald while he was in the service of the United States Army.

By order of Court dated January 18, 1950 a Special Master was appointed to hear the parties and all evidence material to the issue and to report his findings of fact and conclusions of law. Hearings were scheduled to begin on March 13, 1950, but were postponed by agreement of counsel to March 24, 1950, on which day hearings began at 10:00 a. m. and were completed at 1:30 p. m.

Plaintiff was represented by P. L. Pellegrini, Esq., of Somerville and defendant by Philip T. Jones of Weymouth, Assistant United States Attorney. Witnesses are listed in Schedule A and Exhibits in Schedule B hereto annexed.

John Harold McDonald entered the military service of the United States on October 20, 1942 and on November 3 of that year he made application for $5,000 of Na-

tional Service Life Insurance in which he designated as sole beneficiary Mary Mc-Donald, whom he described as bearing the relationship of "sister" to him. There is no dispute that John Harold McDonald entered into a valid contract with the United States and that he died while on active service on September 17, 1944. The only dispute between the parties is whether Mary E. McDonald falls within the class of beneficiaries permitted under the National Service Life Insurance Act.

The plaintiff has two strings to her bow. She contends first that she stood *in loco parentis* to the serviceman and hence qualified as a "parent" under the provisions of Title 38, U.S.C.A. § 802(g) as a permitted beneficiary. The term parent is defined in § 801(f) as including "persons who have stood in loco parentis to a member of the military or naval forces at any time prior to entry into active service for a period of not less than one year." Even if it were material that the serviceman failed to designate the plaintiff as a parent, the Government has conceded that if Mary E. McDonald falls within any permitted class, she is entitled to recover.

In the alternative, plaintiff takes the view that the word "sister" as used in § 802(g) is to be interpreted as including an adoptive sister.

I.

In 1909 John D. McDonald and his wife Annie M. McDonald lived in Bangor, Maine. With them lived two young girls— (1) Mary E. McDonald (then Mary E. McLaughlin), Annie McDonald's daughter by a prior marriage and the plaintiff in this suit and (2) Catherine McDonald, now Mrs. Latsey, the daughter of John D. McDonald by a prior marriage.

John Harold McDonald, the insured, was born John Harold McIsaac on October 29, 1908, the son of Flora and Peter McIsaac; Flora McIsaac was John D. McDonald's sister. On April 26, 1909 John Harold was legally adopted by John D. and Annie McDonald and came to live with the family in Bangor a few days later.

Plaintiff's association with John Harold can be divided into four separate periods.

1. 1909–1914. During this period plaintiff was living in Bangor with her family. From 1912 on she was working in her uncle's theatre where she sold tickets and earned about $22 a week. These earnings she turned over to her mother as a contribution to the running of the household. Throughout this entire period plaintiff took some care of the child John Harold, such as wheeling him out in the baby carriage. But both of John Harold's adoptive parents were living at home; and plaintiff considered her mother, Mrs. McDonald, head of the house.

2. 1914–1938. Some time in 1914 Mary E. McDonald came to Boston and secured employment at Houghton and Dutton at a starting salary of about $18 a week. Before the end of the year she had been promoted to assistant buyer. After she had been working in Boston a few months, her mother and stepfather came from Maine and joined her, bringing with them John Harold, and at a later time her stepsister also joined the household. They lived in an apartment on Myrtle Street.

John D. McDonald was a carpenter by trade and was frequently away from home on jobs for long periods of time. While he contributed something to the support of the household, his earnings were not steady. There were periods when he was unemployed, and when he was away on jobs he contributed less than when he was in Boston. In 1934 he left the family group for good and ceased to contribute anything towards its maintenance.

Mrs. Latsey, plaintiff's stepsister, lived with the McDonalds at Myrtle Street from about 1915 till her marriage in 1921. Her financial contributions to the household in that period were in the form of what both she and her stepsister characterized as "board" and amounted to something less than $10 a week.

Annie McLaughlin McDonald kept house and never, during the period 1914 to 1938 at least, held a regular paying job, although she occasionally did cooking for others and received small amounts for her services.

Mary E. McDonald worked for Houghton & Dutton from 1914 until that firm

went out of business in about 1935, making a base weekly pay of $28 which, together with commissions, averaged a weekly take-home of $35 a week throughout most of that period. From 1935 to 1938 she worked for Clearweave Hosiery Company at a weekly stipend of about $18.

The serviceman John Harold left high school in his second year and went to work (about 1925) as a stock boy earning $15 a week. Thereafter he held a variety of jobs with intervals of unemployment. He was not entirely self-supporting from 1925 to 1938 and he depended on his family's assistance.

Early in 1938 the family group—now consisting of Mrs. McDonald, plaintiff and John Harold—moved from Myrtle to Anderson Street where they stayed just under a year. While there, also in 1938, Mrs. McDonald died.

Throughout the early part of this period plaintiff took some care of the child John Harold. She bought some of his clothes, gave him some spending money and assumed disciplinary functions over him in his adoptive mother's absence. Likewise plaintiff consulted with Mrs. McDonald about John Harold's upbringing problems. And throughout the entire period plaintiff contributed in a substantial measure to the finances of the household and hence to John Harold's support. However, at no time did she usurp the functions of her mother as active parent in control of John Harold. Mrs. McDonald was the ultimate authority over John Harold; she gave him such spending money as the family could afford. Moreover, plaintiff regarded Mrs. McDonald as head of the house.

3. 1938–1940. After Mrs. McDonald's death, the family apartment was given up. Plaintiff and John Harold each took a room in a rooming house on Temple Street belonging to one Mrs. Nagles, a personal friend of plaintiff's. Here plaintiff paid $5 a week for her room and John Harold was charged $2.50 for his. Frequently plaintiff paid John Harold's room rent. During this period plaintiff was employed by Bell Hosiery at a salary of about $20 a week.

In the late summer of 1940 plaintiff became ill, gave up her Boston job and went to live with her aunt in Bangor, Maine. Thereafter plaintiff and John Harold never lived under the same roof.

4. 1940–1942. After plaintiff's departure for Bangor, John Harold had a falling out with Mrs. Nagles and took a room at $4 a week in a house on Hancock Street. While plaintiff was recuperating in Bangor, she assisted her aunt in the operation of a tourist home and during the summer season plaintiff earned for herself an average of perhaps $50 a week.

During 1941 she sent not more than $200 to her stepsister, Mrs. Latsey, to be used for John Harold. Such sums Mrs. Latsey generally turned over to his Hancock Street landlady for his rent, rather than paying John Harold directly.

In December 1941 plaintiff returned to Boston and resumed residence at Mrs. Nagles'. John Harold, however, continued to live at Hancock Street. He was working as a counter man in a restaurant during 1942 and left that employment to be inducted in the Army in October 1942. When John Harold went into the service, he left his personal belongings with plaintiff. Plaintiff took them out to her stepsister's, Mrs. Latsey's to be stored.

While in the service, John Harold sent plaintiff small sums of money. He also purchased five $25 war bonds with plaintiff named as co-owner with himself. He wrote frequently to plaintiff, usually addressing her as "Dear Sister", and frequently closing with "Your Brother".

Plaintiff always felt a great affection towards John Harold which was indeed reciprocal; he was also duly grateful for plaintiff's assistance and kindnesses throughout the years.

Under the circumstances outlined in the foregoing subsidiary findings I find as an ultimate fact that Mary E. McDonald did not stand in loco parentis to John Harold McDonald. While she was a substantial breadwinner for the family during her mother's lifetime, her financial contributions were made to the family as a whole. Such control as she exercised over John

Harold during his minority was always subject to her mother's general supervision and was no more than any older sister would exercise over a brother some 13 years her junior. While plaintiff made irregular contributions directly to John Harold's support after his adoptive mother's death, when he was 29 years of age, this was but the typical assistance which a sister would make to a brother less fortunate or less provident. It cannot be said that plaintiff at any time intended to assume the obligations and status of a parent.

## II.

Whether plaintiff in her status of an adoptive sister qualifies as a beneficiary under the Act depends upon the construction of the word "sister".

The National Service Life Insurance Act of 1940 as originally enacted provided, 54 Stat. 1008, 1009, § 601(e), 38 U.S.C.A. § 801(e): "The term 'child' includes an adopted child." By § 602(g), 38 U.S.C.A. § 802(g) the permitted class of beneficiaries included a "widow, widower, child (including a stepchild or an illegitimate child if designated as beneficiary by the insured), parent (including person in loco parentis if designated as beneficiary by the insured), brother or sister of the insured." Thus the only member of the permitted class who could qualify by adoption alone was the child.

In 1942 the Act was amended by adding a new subsection, 56 Stat. 659, § 601(f), 38 U.S.C.A. § 801(f) which provided, so far as material: "The terms * * * 'father', and 'mother' include a father, mother, father through adoption, mother through adoption * * *". There were now three members of the permitted class who could qualify by adoption: child, father and mother.

Thus while Congress had before it the question of how far to extend the class of permitted beneficiaries to include persons whose claim to membership was derived solely through adoption, it could well have extended the definition to include brothers and sisters through adoption; yet it chose to add to the category of adopted child only those of father through adoption and mother through adoption.

To complete the picture of statutory development, it might be added that the Act was again amended in 1946, 60 Stat. 781, 782 § 602(g), 38 U.S.C.A. § 802(g) so as to abolish any restriction whatsoever as to beneficiaries who might take the proceeds of National Service Life Insurance policies maturing after August 1, 1946.

Yet on September 17, 1944, when the policy in suit matured, there was no language anywhere in the Act which would admit an adoptive sister to the permitted class of beneficiaries. Congress twice had the opportunity to consider the question of adoption as qualifying a beneficiary— once in 1940 and again in 1942—but neither time did it see fit to extend the membership to brothers or sisters by adoption. Nor is there anything in the legislative history of the enactments which would give substance to any claim that there existed an unexpressed Congressional intent to include brothers and sisters through adoption.

It has been urged that in interpreting the word "sister" as used in § 802(g) consideration should be given to the parity of adopted children with natural children under the local state law of descent and distribution. To be sure, under Massachusetts law, Mass.G.L.(Ter.Ed.) c. 210, § 7, as well as under Maine law, Me.Rev. Stat. c. 145, § 38 (1944), the estate of an adopted child dying intestate is distributed in the same manner as if he had been born to the adoptive parent in lawful wedlock, so that the blood daughter of an adoptive parent inherits from an adoptive son the same share as would a blood sister from a blood brother. However, even if the rights created by a federal act can be subjected to the local idiosyncrasies of state laws, the other provisions of the Act clearly negative a Congressional intent to refer to state law; for since Congress was not content to leave to local state determination the meaning of child or father or mother, it can scarcely have intended to leave to such determination the meaning of brother and sister.

The foregoing interpretation of the National Service Life Insurance Act is in accord with Woodward v. United States, 8 Cir., 167 F.2d 774; Beach v. United States, D.C.N.D.Ohio, 79 F.Supp. 747; Droney v. United States, D.C.D.C., 59 F. Supp. 154. A directly opposite result was reached in the Third Circuit, where Judge Goodrich held that an adoptive sister of the insured was a "sister" within the meaning of the statute. Carpenter v. United States, 3 Cir., 168 F.2d 369, 3 A.L.R.2d 841. This opinion I reluctantly decline to follow.

### Conclusion

Since plaintiff does not fall within the class of beneficiaries permitted by the National Service Life Insurance Act, judgment must enter for the United States.

Philbert L. Pellegrini, Somerville, Mass., for plaintiff.

Philip T. Jones, Asst. U. S. Atty., Boston, Mass., for defendant.

WYZANSKI, District Judge.

This case is before the Court upon defendant's motion for confirmation of the master's report and upon plaintiff's objections thereto.

Pursuant to the jurisdictional provisions of 38 U.S.C.A. § 817 Mary E. McDonald sued the United States on account of a National Service Life Insurance policy issued to John Harold McDonald while he was in the United States Army. In his insurance application made November 3, 1942, and in the contract of insurance based thereon, John designated as his sole beneficiary Mary, the plaintiff, whom he described as his "sister". John died September 1944.

The dispute between the parties is whether Mary falls within the class of beneficiaries permitted under the National Service Life Insurance Act.

Mary first contends that she is a "parent" under 38 U.S.C.A. § 802(g), as that term is defined in 38 U.S.C.A. § 801 (f). But the master's findings of fact—which the parties agreed should be final—dispose of that issue adversely to her.

Mary's other contention is that she is a "sister" under 38 U.S.C.A. § 802(g). That second contention arises upon this state of facts. When John was five months old, with the assent of his natural parents who lived in Massachusetts, he was adopted, pursuant to a decree of the Probate Court of Suffolk County Massachusetts, by John D. McDonald and his wife, Annie M. McDonald, both of Maine. In the household of Mr. and Mrs. McDonald there was then living a minor child, Mary, the plaintiff in this suit. She was the natural and legitimate child of Mrs. McDonald and her first husband, a Mr. McLaughlin. Thus the precise question is whether a girl who was at the time of John's adoption a child of *one* of John's adoptive parents is John's "sister" for the purposes of the National Service Life Insurance Act.

This question is new in this Circuit, but in other Circuits there is a diversity of views. Favorable to plaintiff is Carpenter v. United States, 3 Cir., 168 F.2d 369, 3 A.L.R.2d 841. Adverse to her contention are Woodward v. United States, 8 Cir., 167 F.2d 774; Beach v. United States, D.C.N.D.Ohio, 79 F.Supp. 747; Droney v. United States, D.C., 59 F.Supp. 154 and Decision No. 514, dated March 10, 1943 of the Administrator of Veteran Affairs. Since these authorities have already fully canvassed the relevant considerations and since only the Supreme Court of the United States can make a final resolution of the conflict between the Circuits, I shall merely state summarily my reasons for following the Carpenter case and allowing plaintiff to prevail.

At the time John applied for and secured a contract of National Service Life Insurance, that is in November 1942, Congress had stipulated that he should "have the right to designate the beneficiary * * * but only within" certain classes —that is "to a widow, widower, child (including a stepchild or an illegitimate child * * *), parent (including person in loco parentis * * *); brother or sister of the insured." § 602(g) of the Second Revenue Act of 1940, Act of Oct. 8, 1940, c.

757, 54 Stat. 974, 1010, 38 U.S.C.A. § 802(g).

In the original 1940 Act the only further definition of these relationships was given by § 601(e), 54 Stat. 1009, which provided that "the term 'child' includes an adopted child."

Two years later, section 7(f) of the Act of July 11, 1942, c. 504, 56 Stat. 657, 659, 38 U.S.C.A. § 801(f), added a definition that "the terms 'parent', 'father', and 'mother' include a father, mother, father through adoption, mother through adoption, and persons who have stood in loco parentis to a member of the military or naval forces at any time prior to entry into active service for a period of not less than one year."

At no time did Congress define for the purposes of the National Service Life Insurance Act the terms "sister" or "brother".

It would be logical to argue that since Congress expressly defined the term "child" and "parent" to cover not only blood relationships but also adoptive relationships, the failure of Congress expressly to define the terms "brother" and "sister" implies that the legislature meant in those instances to cover merely the more usual blood relationships and to omit adoptive connections. Such an argument would rest upon a refinement of the familiar maxim *"expressio unius, exclusio alterius"*. And the argument would be somewhat fortified by the fact that in comparable legislation covering insurance for those who served in World War I Congress expressly included adopted brothers and sisters within the permissible class of beneficiaries. Section 3(6), Act of June 7, 1924, c. 320, 43 Stat. 607, 608, 38 U.S.C.A. § 424(6); Woodward v. United States, 8 Cir., 167 F. 2d 774, 778. See Carpenter v. United States, 3 Cir., 168 F.2d 369, 371 note 4, 3 A.L.R.2d 841.

 But in interpreting the National Service Life Insurance Act, as in all statutory construction, "the general purpose is a more important aid to the meaning than any rule which grammar or formal logic may lay down." Holmes, J., in United States v. Whitridge, 197 U.S. 135, 143, 25 S.Ct. 406, 408, 49 L.Ed. 696, quoted by Frankfurter, Some Reflections on the Reading of Statutes, 47 Col.L.Rev. 527, 538. While no preamble, committee report or legislative debate is available to teach the purpose of the terms used in the National Service Life Insurance Act, the statutory scheme is plain enough. Congress offered life insurance at bargain rates. The Government charged less than an insurance company would charge but it offered a contract which gave the policyholder less freedom to select a beneficiary than a commercial company would allow. Probably, as Judge Goodrich said in Carpenter's case, one purpose of the Congress was to make insurance available to servicemen who wanted protection and could not get it through commercial channels. Yet no one familiar with the strong pressure exerted by the Army, Navy and Air Force to induce servicemen to take out insurance would maintain that that was the sole purpose. An equally or more important Congressional purpose was to encourage the serviceman to meet the moral claims of near relatives with whom he was likely to have lived at some period in his life. Congress did not go to the extreme of dictating to the insured that if he died his insurance must go to the probable chief mourner or the person who would be most likely to become a public pensioner or a recipient of a government bonus. But similar considerations were not wholly absent, for Congress in 1942 and indeed until 1946, see § 4 of the Act of August 1, 1946, c. 728, 60 Stat. 781, 782, 38 U.S.C.A. § 802 (g), was unwilling to allow the soldier or sailor to select as a beneficiary a mere friend or distant relative.

 The statute thus embodies a policy of restrained generosity. And of course the restraint is as much a part of the policy as the generosity. We must be mindful of Judge Learned Hand's caution that a statutory " 'policy' is as likely to be found in its limitations as in its affirmations," Mirotznik v. United States, D.C.E.D.N.Y., 64 F.Supp. 635, 637. But the restraint or limitations imposed by Congress, as is evinced by the 1940 definition of "child"

and the 1942 definition of "parent," were not motivated by a primitive concept that the only genuine ties are those of blood, or by the sort of considerations which would lead a private testator to limit his devise of a fee to "heirs of the body" or like classes of recipients. The more subtle purpose of Congress in limiting the possible beneficiaries was to focus the serviceman's attention upon, and to restrict his generous impulses to, those who would normally have the strongest moral claims upon him and who would be natural objects of Congressional bounty. The restrictions placed by Congress were to prevent the serviceman going outside the innermost family circle. He was not to use his and, more important, perhaps, the Government's contributions to respond to the blandishments and allure of passing friends. Nor was he to enter into a quasi-tontine arrangement with his fellow servicemen.

[5] All these Congressional purposes are fully satisfied if the term "sister" is defined so as to include a natural daughter of both or even, as here, of only one of the adoptive parents of the insured. Under American statutes, unlike the English statutory system [See Buckland and McNair, Roman Law and Common Law, p. 42], adoption is more than a special form of guardianship. It is complete incorporation into the family circle. An adopted child and a natural child usually dwell on a parity at the same family hearth. They are regarded not only by sociologists [See Goodrich, J. in the Carpenter case supra at pp. 372–373] but by the average relative, neighbor, teacher and other private or public authority as brother and sister. If anything happens to the one, the other is apt to mourn as deeply and to be as adversely affected, financially or otherwise as though the relationship had existed from birth and not merely from the date of a judicial decree.

Indeed it would have been a virtually incomprehensible policy for Congress to restrict beneficiaries to blood brothers and sisters and to exclude adopted brothers and sisters who have since childhood shared a home. Congress is not like a private testator or donor who may have understandable if absurd prejudices in favor of persons who share some of what he regards as the superior or at least unique type of genes that enter into his own or another's body. The only readily understandable ground for a Congressional limitation of beneficiaries is to restrict insurance funds to close family members to whom the serviceman and Congress have moral and may have financial obligations. That test is fully met by adoptive brothers and sisters —at least if the adoption does not occur about the time a person enters upon or after he has entered upon military or naval service. Such a case might be a colorable scheme to circumvent the restrictions of the National Service Life Insurance Act.

█ From what has been said it is obvious that I do not rest my conclusion on the local state law of adoption. While, of course, only a person legally adopted pursuant to local law could be an adoptive brother or sister, the question whether adoptive brothers and sisters are eligible beneficiaries under the National Service Life Insurance Act is a federal not a state question. See both Carpenter and Woodward cases supra.

█ Nor have I turned my opinion on dictionary definitions of the terms "brother" and "sister". While there are times when a lexicographer is helpful, there are other times when everyday speech is a better guide. McBoyle v. United States, 283 U.S. 25, 26, 51 S.Ct. 340, 75 L. Ed. 816. See Frankfurter supra at p. 536. Statutes setting terms for contracts to be made by the Government with men and women on active service are not to be read with an eye squinting at older common law cases. Cf. Zazove v. United States, 7 Cir., 156 F.2d 24, 26. They should not be construed like wills drafted by lawyers familiar with the variegated devises in fee that have come down encrusted with a mediæval tradition of interpretation. See Note, 45 Harv.L.Rev. 890. The statutory limitations upon servicemen's insurance contracts are to be read as they would be by the average man in uniform without a lawyer or a dictionary at his elbow. And if the average man in uniform were shown a National Service Life Insurance policy

application and were told by his commanding officer that under the statute he could name as a beneficiary a sister, it would probably not occur to him to distinguish an adoptive sister from a blood sister. In everyday speech people speak of sisters and brothers, not blood sisters and blood brothers or adoptive sisters and adoptive brothers. And that common usage is the best guide in interpreting statutory language intended to be incorporated in literally millions of contracts with average people.

Motion to confirm the master's report denied. Motion to recommit the case to the master denied. Judgment to enter for plaintiff.